Good morning, your honors. May it please the court, Gregory Fair for the appellants. I would like to reserve three minutes of my time, if I could. Sure, just keep track. Great. So I'd like to talk in just a bit about how the district court committed reversible error. Number one, by refusing to apply the unclean hands analysis, and in fact refusing to so much as mention, much less consider or discuss, our extensive and uncontroverted evidence that we presented to the district court of the Kardashians' rampant, blatant, and willful violations of my client's rights in the very same marks pursuant to which they seek relief. And incidentally, these violations, to be clear, are violations of Lanham Act Section 43A. They're not merely contractual violations. And the district court did so based on a standard that the district court itself fashioned that is nowhere to be found in this court's precedent and is, in fact, contrary to it. Number two, by refusing to perform the prior material breach analysis, which even the Kardashians now in their answering brief concede is necessary, and refusing to so much as mention, once again, our evidence of the prior material breaches, and did so based on what we feel is a misinterpretation of out-of-circuit, non-binding cases stemming from the Third Circuit's opinion in Jiffy Lube. And so you think Jiffy Lube, and I think there was the McDonald's case maybe from whatever that other circuit is, Eleventh Circuit, I think, those two cases seem to me to be most on point. And you think they're wrongly decided and we shouldn't basically incorporate them as part of our circuit's law, or just that they were misapplied? Well, a couple of things. First of all, I think that they're not necessarily wrongly decided, but the district court's interpretation of Jiffy Lube to impose a per se rule that you, which the district court, and this is on page 12, ER 12, of its opinion, said you don't have to consider prior material breach. It doesn't matter if the license was validly terminated. Well, let me just walk you through how I read Jiffy Lube and McDonald's applying here, and then you stop me to correct me, because it's not in your favor. So I read those cases as saying there needs to be, the district court does need to make sure that the license agreement was properly, that the termination was proper. I think that's the word that those two cases use, right? Correct. But proper in this context is a term of art. It means that there is some facially legitimate provision in, there's some provision that, on its face at least, allows termination under certain circumstances. And then the question for the district court is, do those circumstances exist, right? So here, your opponent's argument is that they terminated because there was no royalties, in fact, were not paid. You then say, well, you didn't write a check to them, right? I do want to get to that, because that's an important point. But you wrote a check to them for royalties. I want to address that point. Yes or no? No, but they have been paid everything that they are due under the agreement. So your position is that no royalties are due under the contract because they had, before that, breached basically from the get-go, right? No, no. No royalties are due under the contract because... They never sent an invoice? Because number one, they expressly, the amounts that they're claiming were due are amounts that they voluntarily agreed to give up in exchange for other valid and valuable consideration of the... You're talking about the guaranteed minimum? The guaranteed minimum. No, forget that. Let's give you that, that that's not in the picture. Then with respect to, I think you're referring to the ordinary royalty payments, it's uncontroverted that the express provisions of the license agreement that require invoices to be sent and govern how and when payments are to come due under the license agreement, those have never been complied with. Now I would also say... So just to be clear, hang on, just to be clear. So sales of product on which royalties were owed were made during this contract period? Is that true? Well, royalties in theory would be owed were there an invoice presented. Got it. Okay. So your position is that we were never, under the provisions of the agreement, no royalties became due, quote unquote due, unless and until we got an invoice and they never sent that? Correct. And that's a requirement for terminating the license is failure to timely make royalty payments due. So what's your response to their argument, which you know in the brief, which is they couldn't give you an invoice because you didn't report sales. Well, that argument is both wrong and it's disingenuous. First of all, the payment provisions, the Kardashians, they're in there for a reason. The Kardashians, and this is why they haven't taken their 40% interest in the company that is their line, they're worried about tax consequences. So they say, well, we were thwarted from issuing invoices by failure to issue quarterly statements. Not true. We gave them, we sent them for the first quarter all of the information they needed, including the calculation of how much their invoice to us should be. They never issued an invoice. Give me that record site. That's something I don't have in front of me. When you come back. When I come back, I'll give you that record site. It might be 711, 711. There seems to be a dispute between you and your adversary on that issue. They claim they never got anything, so they couldn't pay any of the royalties. No, this is actually uncontroverted that we sent them, there is an email sending them the information of how much was owed for that first quarter. And the Kardashians, again, they are concerned about the timing of payments for tax reasons, so they wanted control over when payments came due to them. That's where in the record that that was their concern? Well, again, this is a preliminary injunction record, so the evidence is more diffuse. We have evidence in the record that that was their concern with taking their 40% interest in Haven, and I can say from my client's extensive dealings with them, tax concerns are paramount. What you do is before, and it's a preliminary injunction, and we don't expect much to be there because it's supposed to be preliminary, and we expect the facts to be different when the case goes to trial. But we're only ruling on the preliminary injunction. And if the argument is they were never sent, and you say, yes, we did send one, but that's not in the record, that doesn't help us. Well, it is in the record that we did send that, and that's uncontroverted. I believe it may be ER 711, though my colleague is checking that out. But to the extent that the court says, well, why would they not send invoices, there's a good reason for it. So there may be no evidence in the record on why, but the inference can't be made against us on that point. At the end of the permanent injunction, we'll know why. Can I ask you just a contractual interpretation question? You can. I fear that I may not have finished answering Judge Kristen's point. So that was the first attempt that we made. Then when they jettisoned their agent, APA, who's now suing them, who was the designated specific agent for issuance of invoices under the license agreement, we proactively contacted them and said, hey, how do you want to deal with this? What do you want us to do, given that your agent for issuing invoices is no longer there? They never responded. We contacted them twice in June of 2015. Never a response. So they voluntarily chose not to seek to issue invoices. They have never asked us for quarterly statements, and this is important, formally, informally, or otherwise, aside from complaining about this issue in their legal briefs. And that is telling. Also under Section 5E, there is an express provision that says that they have the right at any time to inspect our books for the specific purpose of determining how much that's how much to ask you about. Because I just think your interpretation of the contract is wrong, in the sense that you think because they didn't send you an invoice, the royalties never became due. There's that little clause. This is why I want you to tell me why my reading of this is wrong. It says, it being understood that any failure, let's just focus on failure, in generating or delivering an invoice shall not affect the licensor's rights to receive the amounts due. I read that as saying, the amounts are due, regardless of whether they send you an invoice. And their failure to generate that doesn't in any way relieve you of the obligation to pay. Well, respectfully, I think that's an incorrect reading of the contract. Because what that means is that the Kardashians clearly anticipated that they would have long delays in issuing invoices because they didn't want to be paid for tax reasons. So, they wanted to make sure that a delay in issuing an invoice... Hang on, hang on, hang on. I'm not going to interrupt you if you just let me get my question out and then I'll let you... I sat back and let you finish. The reason I think it's wrong, your reading is wrong, is because, as I understand it, when this agreement was originally drafted, it was joined with the guaranteed minimum royalty payment provision, right? And so the assumption was that they are going to be getting a check every quarter, no matter what. This whole 5E provision is just to figure out what the adjustment to that is, whether they're going to get more than the minimum, or maybe, I guess, I think there was a provision where they could get kind of a credit against them if the sales were below, right? That's not quite right. It's an annual. The guaranteed payments were minimum annual payments, so they would be made annually. And then the separate invoices... Every quarter, no? What's that? I thought it was every quarter. Quarterly guaranteed. You could be right, and I'm hearing to my right-hand side that it was quarterly. My understanding was it was annually. So what I'm reading this to say, when you understand that it was in conjunction with the guaranteed royalty payment provision, is that, sure, we're going to generate these invoices that we'll send to you after you give us the data on the sales, so that we can figure out what adjustment needs to be made to the guaranteed payment that you've already given us. But the failure on our part, or delay on our part, to generate the invoice doesn't in any way affect the fact that the amounts are due and owing now. It's just that... Right? So why is that wrong? You're correct with respect to the guaranteed payments, because there is a due date for those to come due independently of any invoices being sent. But with respect to once they gave up the guaranteed payments in exchange for quintupling their stake in the company that owns the line from 8% to 40%, there were no payments that came automatically due under the agreement. And the question that the district court, and maybe you can ask the Kardashians, that no one has answered, is if these royalty payments came due, when did they come due? Because under the plain terms of the agreement that the parties struck, Section 5E says these come due five business days, I believe it is, after the issuance of an invoice. That's when you have to pay. And I would say that part of the provision that you're talking about was meant to say that any delay doesn't affect the guaranteed payments coming due. Part of it was also, just to make clear... No, the provision I was reading has nothing to do with the guaranteed payments. It's in 5E. It's dealing with the regular, whatever you call it, the regular royalty payments that would be in addition to... To the extent that you're talking about regular royalty payments, there is one way for those to become due under the contract, and that's an invoice is sent, then they are due five business days after the invoice is sent. That's when they come due under the contract. There is no other provision for them to come due, and they can't just magically come due under the contract. There is just no provision for that. We would have no idea when or in what amount such payments came due. Okay. Why wouldn't a reasonable interpretation of the contract, again, given that this guaranteed payment was in there, provision was in there before, that the royalties became due every quarter? That was the point at which you were obligated to send them the statements. And so, I mean, assuming that sales of covered product occurred, right, during that quarter, that once the quarter ends, whether you send them the data necessary to generate the invoice or not, they're owed whatever the percentage is on the wholesale sales. Simple answer. Because that's not what the contract says. It could have said that payments come due at the end of each quarter automatically. It could have said that, fully admit that. It does not. Section 5E expressly sets when and how payments come due under the contract for ordinary royal royalty payments, and that is tied expressly. The timing. There is no other timing provided. It was something that the parties bargained for. They're sophisticated parties. Maybe it's not the best mechanism. Maybe it is. I'm agnostic as to that, but that's the mechanism that the parties provided for, and that's when the payments come due under the bargain that the parties struck. And I realize I'm way beyond reserving three minutes, so I'd like to, if I could, just respond. Well, you're out of time, but we'll give you a little bit more time when you come back. Good morning, your honors, or almost afternoon, and may it please the court. My name is Jonathan Stein-Sapir from the law firm of Kinsella, Weitzman, Iserkamp, and Aldisert. For the plaintiffs and appellees, the Kardashian sisters and their loan-out corporations, I do want to start just where we left off on this invoice issue. The contract in 5E very specifically says they have to send us accounting statements 30 days at the end, after the end of the contract quarter. Okay? Now, they say we never ask. The second sentence you're pointing out? Yeah, let me just open up to it. After the end of each quarter, licensee shall provide to the licensors a written report. That sentence? Yes. Okay. So licensee shall provide us with a written report. Now, they say that we never ask for that. On February 26, 2016, again on April 1, 2016, and again on June 22 of 2016, and I can give you the record sites for those letters, they're in volume 6 of the excerpts of our letters, we say we want to be paid. We list the minimum guarantees, and I can talk about that, but we also say we want to be paid the earned product royalty statements. Now, if there was confusion on the part of our licensee about what they needed to pay us, they could have picked up the phone, they could have emailed us, they could have done anything. What did they do? They sued us for $180 million 20 days after we sent our first demand for payment in state court in violation of an arbitration clause, and that's now in a big arbitration that includes all of this. So, and there's a specific duty of good faith and fair dealing in every contract, but it's actually laid out specifically in this contract at paragraph 17. So when we ask for payment, if there's some confusion on their side, and there's a duty of good faith, pick up the phone and call us. Try to figure it out. I'm going to ask you to respond, just forget about the, you guys have a long history with each other, and it's obviously pretty acrimonious. Just as a matter of contract interpretation, respond to your opponent's argument that in fact, sorry, in fact, there is no due date pegged to anything other than the sending of an invoice. Do you dispute that? Do you say that the royalties became due at some other point? Just like Judge Selna and I think you picked up on, and I know you're just, you know, final ruling there, but I would pick on exactly the same point that Judge Selna picked up on that you quoted, which is the failure to send an invoice doesn't mean that the payment is not due. And if we think of the duty of good faith and fair dealing, where we are licensing them really valuable intellectual property, and we're saying we want to get paid for its use because we haven't been paid in four years, and their response is never to raise this invoice issue, by the way. This invoice issue was first raised in this lawsuit. So when we sent our- What was their response? What was their response? Well, their response is something that if there's anything you can look at in this case, their response is just, it's unbelievable, frankly. Their response was on July 7th, 2016. We had given them a 10-day notice, 10 business day notice on July, on June 22nd. Given them 10 business days, which turned out to be about 15 days, and said, please, and we actually waived the guarantees. We said, forget about the guarantees. We know there's a dispute about that. We just want our legal fees, which is something they can never explain why, just as an aside, the term sheet that they're saying waives guaranteed minimum royalties. It also says that they have to pay the legal fees of Kinsella, Weitzman, Iser, Kump, and Aldisert, my firm, upon closing. So they're- Counsel, focus on the answer to the question. Okay, I'm sorry. That's all right. I'm sorry. No, I apologize, Judge Kristen. If you could. But no, the 6 ER 1205, the July 7th letter, what we are told as to why they're not paying us anything, and I'm just going to quote it, and it's at ER 1206. No royalty payments are due, comma, nor will any be paid unless and until your clients compensate my client for the considerable damage sustained as a result of your client's breaches. And then the last sentence of that paragraph says, until my client is made whole, any monies due to the Kardashians are properly withheld as an offset to my client's damages. And what are his client's damages? Look in the record. 1364, where they demanded $180 million, between $10 and $180 million. So what he was essentially saying was, we're never going to pay you a dime until you somehow make up these made-up damages claims of $180 million, and what he's saying is we can hold that as an offset. Okay, that's what he told us, and that's why we terminated the next day. And he has never, or excuse me, the defendant has never defended before Judge Selna or here that he was entitled to determine that they had been damaged by between $10 and $180 million and then keep money as an offset, because that kind of argument would be rejected out of hand. It violates the duty of good faith and fair dealing. The California courts, as do I believe the federal courts, don't like self-help. So they basically told us, we're never going to pay you. Okay, so your argument is that the royalties became due on February 26th when you sent the demand? My argument would be, well, in context here, the royalties were already due as of, let's say, 30 days of the last quarter of 2015. Now what had been going on here in reality was both sides were not demanding performance from me either. As Judge Selna specifically held, both sides were in a joint effort to try to find Prince Charming to come and rescue them out of this marriage of necessity, and it didn't happen. So we finally said, okay, guys, we're going to have to be in business together, so we want you to pay us. So the money was already due, we just hadn't demanded performance of it, and we gave them an opportunity to cure. It became due on January 30th, 2015. Because this is my point. Let's say that you, forget about the actual acrimonious history you guys have here. Let's say that you never sent them an invoice for two years, they never paid you any royalties, and then you just decided to terminate the contract and said, hey, royalties were due, you didn't pay them, sorry, you're out of luck. I assume that you'd have to at least have done something in the interim to demand payment, right? Absolutely correct. The contract says you have to give a notice and opportunity to cure. Okay, so that's what I'm asking. If we were going to determine, because I think we have to determine to rule in your favor that royalties were in fact due, that's what permits you to terminate the contract on the ground that you asserted. So when, I think it's a fair question from your point of view, so when did the royalties become due? The royalties became due at the end of every contract quarter. The royalties were due. They were also, the second thing was they hadn't paid the attorney's fees, which were due. Whenever they say that the guaranteed minimum somehow disappeared because of that term sheet, whenever that happened, the attorney's fees became due because those were joined together. They can't have their cake and eat it too, and they've never explained that. So they were due, what I would say is they were technically due at the end of every quarter, but we could not terminate without first giving them a notice and opportunity to cure. We were not doing that because acrimonious, yeah, it was acrimonious beginning in 2016, but in 2015 we were actually trying to work together and find a solution to basically both sides' bad investment in another company that led to this. So it became due, yes, in an esoteric sense it becomes due at the end, 30 days after the end of every calendar quarter. But we have no right to terminate until we give a notice and opportunity to cure, which we gave them three notices and opportunities to cure. We were very patient with them. But I do want to say that the injunction could be affirmed even without the termination, and that's because Judge Selma specifically found that the actual products at issue here had been disapproved by us. I mean, if you look at the record on that, the emails from our client could not have been more clear. He says, we are not approving any products, and under paragraph seven, and this is key to every trademark license because the licensor has to exercise control over the products or else it's naked licensing and the trademark's not good. We have to approve everything. They sent us products to approve, and we're scratching our heads because they had just told us to go take a hike, and we wrote them an email that could not have been more clear. We do not approve this, do not take our silence as consent. But you've got to show that the contract was properly terminated under its provisions, right? Well, no. I'm sorry to interrupt. But what I would say as far as the consent thing, no, because if they, the contract required us to consent to all uses of our names, images, and likenesses, which makes sense. They don't want them just going out and making products without us seeing them. We expressly disapproved those products. So even if the contract was still in effect, Judge Selma's specific finding, and I just want to make this clear, it was at the first volume of the excerpts at page eight and nine, he twice says, we expressly disapproved of those products and then found out they went and sold them anyway. So even if the contract remained in force, your point is that you were still entitled to the injunction because they were trying to market product that you had disapproved of. That we'd expressly disapproved. Absolutely. And I don't know if you have questions on the unclean hands arguments. I'm certainly willing to, or happy to address them. Yeah, okay. The only thing I would say is that the request made that somehow a new, the Worthington case from the Tenth Circuit sets out a new standard, or a different standard from the Ninth Circuit's, I'm not really sure I agree that the Ninth Circuit wouldn't have affirmed in that case. It was a bench trial. And in any event, they never asked Judge Selma to apply that standard below. And so I don't think it would be fair to remand, to have him apply a standard that no one really asked him to apply. And I think the one point that I would, I'm happy to close unless you have arguments about, or questions about the bond or anything like that, but the one thing I just want to just make very clear is that I wish we had said this expressly in our brief, though we said it implicitly, which is they cannot cite a single case where a licensee of a trademark or a right of publicity, or even a copyright or patent, is not getting paid, and yet the license, and is not getting, or the licensure is not getting paid, and yet the licensee can still use the mark. There's just not a single case holding that. But Judge Selma said that, so we understand. Oh, did Judge Selma say that? Oh, I'm sorry. I apologize. No, I have nothing else, and I would just ask that the district court be affirmed. As long as you have some time available, let me sneak in here. What's going on in the district court? Have you gone ahead and proceeded towards a permanent injunction? No, so let me explain what's going on in the district court, which is actually another good point here. The contract is an arbitration clause that allows for injunctions, so we are now in a jams arbitration that is absolutely proceeding before three federal judges. Two of them are retired federal judges, two of whom are magistrate judges, Margaret Nagel, Stephen Haberfeld, and District Judge Philip Perot from Nevada. So the arbitration is going forward. They're making all their arguments there. We're making all these arguments. This injunction is merely in place pending that arbitration, assuming, we hope, that the arbitrators agree with us that we properly terminated. We assume that we will get a permanent injunction, or this license expires, I think, by its terms in May of next year, so it won't really matter anymore unless they were, which I can't imagine they would, you know, just going to go forward after the license term. Well, we've tried to make clear in our sports forum versus United Press that we expect counsel to go ahead below, and they shouldn't rely on any decision we make here because there will be different facts and different standards, but if I understand correctly, you're not going forward at all in that case because you hope to dispose the entire litigation by this arbitration? Yeah, so this case, this entire case, we filed it as a complaint only for injunctive relief, and it was then moved into arbitration. So what would have been going on in the district court had there not been an arbitration clause is now going on in the arbitration, so we are doing what this court is said to do, which is to go forward with your case and not rely on the preliminary injunction. We're definitely going forward. Our clients can attest to that. They're spending a lot of money on an arbitration about these very issues. And has the district court been advised that it's time out? Oh, yeah. The district court entered a stay of the litigation and has instructed us to, as they usually do, to provide status reports every, I think, six months, and I think we're doing that to the district court. So he's fully aware that there's an arbitration going on. I think he's happy that he's not dealing with it, probably. Thank you for following sports forum. It's a very well-written opinion. A former chief judge, I assume. Thank you, Your Honor. Thank you, Your Honors. So, I think it's extremely telling that counsel just said royalties came due on January 30, 2016. That is, I mean, the parties could have provided for that, but they did not. It is nowhere to be found in the license agreement, and we still haven't gotten an answer as to when royalties came due, if they came due. With respect to their claim that they expressly disapproved, first of all, the district court apparently rejected that argument because it was accepting basically every other argument that they made. Their corporate counsel, Todd Wilson, they had, first of all, Mr. Kump had sent a letter on April 4, accusing us of breaching the license agreement by failing to launch the updated product line that we were in the process of developing earlier, and said that the old line was embarrassing and that it needed a facelift. So then we sent to them the updated product line, which when we launched it, for the couple of days we were able to sell it, it got rave reviews. And what they did with that was they said, well, Todd Wilson sent a letter saying, well, we got your stuff, we're not going to respond, but don't take our silence, that was his word, as approval. Well, if you look at the license agreement, some license agreements say that if you don't expressly approve products, it's deemed disapproved. This license agreement says if you don't expressly disapprove products within seven days, I believe it is, they are deemed approved. So here they said, we're just going to be silent on the matter. That was Todd, that was an email from Todd Wilson, it would have been in the first half of May of 2016, and I apologize for not having that. I got it, okay, thank you. So there's that. With respect to the June 7th letter, that was a letter from me, I can tell you I never said that we are never going to pay you under the license agreement, I said a couple of true things, number one, no royalties are due at this time, and number two, you guys are in prior material breach. Both parties were rampantly exchanging letters accusing the other of breach, and we just said you're in prior material breach, so you're not in a position at this point to be able to demand performance from us. So that was the April 7th letter, or June 7th letter, or July 7th letter, excuse me. There are two July 7th letters, but I know which one you're talking about. There are, correct. And, you know, they've tried to accuse us of somehow thwarting settlement discussions. That's just simply not true. We've participated just as much as they have. They've at times wanted to dictate the terms of it. We were trying to set up an in-person meeting at our offices to discuss, and finally acceded to their demands and put the principals, got our principals of Hilaire and Haven on the principles, to try to discuss and settle the matter, and it did not work out. So let me ask you, do you agree with what counsel said, that it's all time out below? Yes. You also agree that this arbitration is set to try and settle everything so you won't have to go back to the district court? With the exception of, well, there are two exceptions, possibly the permanent injunction, and then also with respect to the claims against individuals, Judge Selna held that those claims are not arbitrable, and so he has retained those claims. Those are not before us. Right. But as far as the injunction is concerned, that's going to be stipulated or you're going to start back into war below? I would guess that whoever prevails in the underlying arbitration is going to do it. The thing that I'm concerned about is that we're at a stage now where, as former Chief Judge Chambers said, we're going up the hill without a payload. It makes absolutely no difference what we do now because it's time out, and unless the arbitration that both of you are agreeing to and entering into in good faith, unless that fails, what we do here is irrelevant. In addition to that, we're only talking about a preliminary injunction, and you got the preliminary injunction because nothing is happening. Would you be offended if we considered the idea that we'll just hold back further work on this case until we find out that our work is relevant? Is there something that you need, a final decision on a preliminary injunction at this point? Yes, Your Honor. That's a good question, and determination is vital on our appeal. Right now, the status of Haven is it's just a dormant shell that doesn't have anything to do because it has been enjoined from selling the only product that it's ever sold. It would be very vital to us- To get a decision here? To get a decision here, vacating the preliminary injunction, yes. On the preliminary injunction, which has nothing to do with whether or not the arbitration is going forward, and you don't plan to do anything in the district court until there is an arbitration finalization. Correct, but the preliminary injunction right now prevents us from doing business. It's vital to get a determination one way or another whether we're able to resume selling the products that we have a license to sell or we're not and we can't conduct business. You mean if you win on this injunction, you're going to go ahead and do business despite the arbitration going forward, is that correct? There may be some confusion, but Judge Selna ruled that we were enjoined from selling the for a year and a half previously pursuant to a valid license. So yes, we have the rights to do that. We are the licensees under a valid license. But you haven't really answered Judge Wallace's question. His question is, you're going to go forward. You want to go forward and be back in business. You're out of business at the moment, right? Yes, I believe my client would like to resume business. Is the answer yes, you want to resume your operations while the arbitration is ongoing? Yes, I believe that's the case. And I think, you know, in addition to that, that I believe would help facilitate some sort of a resolution of the issue because it doesn't seem that there are very good feelings between the parties and there are duties on both sides to be performed. But right now... Counselor, you're seriously over time. I apologize. I appreciate your arguments. We appreciate all of your arguments. Thank you so much. Thank you very much. We're going to go ahead and stand and recess. Thank you. All rise. Thank you.
judges: Wallace, Christen, Watford